**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil Action No. 5:26-cv-906**

| | |
|---|---|
| COMPASS, INC. and COMPASS CAROLINAS, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>TRIANGLE MLS, INC., d/b/a DOORIFY MLS,<br><br>*Defendant*. | **COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked in 16 North Carolina counties in and around the Research Triangle because of rules set and enforced by Defendant Triangle MLS, Inc., d/b/a Doorify MLS ("Doorify MLS"). Each of the voting directors listed on Doorify MLS's website works for a real estate brokerage, and the majority work for brokerages that compete directly with Compass and its agents, and they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes. Plaintiffs bring this lawsuit under 15 U.S.C. § 1 to stop Doorify MLS's anticompetitive behavior.

2. Homeowners want a choice. Plaintiffs Compass, Inc. and Compass Carolinas, LLC (collectively, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of Doorify MLS. Under North Carolina law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS sends the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as Doorify MLS requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. Doorify MLS, one of the largest MLSs in the country by subscriber count, with more than 14,000 subscribers and a service area spanning 16 North Carolina counties, is a combination of Compass' direct competitors, and it is controlled by a Board of Directors

dominated by Compass' direct competitors. Under the Doorify MLS rules, once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media, or publicly markets the home in any way Doorify MLS defines as "public marketing," the listing must be given to Doorify MLS and its co-conspirators within one calendar day, and the agent and homeowner must follow the many restrictions in Doorify MLS's rules—even if the homeowner gave the agent a lawful marketing instruction that conflicts with the Doorify MLS rules.

5. Although North Carolina law states that, as agents, real estate agents owe their clients fiduciary duties and must follow their lawful instructions,[1] if a real estate agent follows the client's lawful instruction to publicly market a home outside of Doorify MLS, the agent then faces fines of at least $500 for a first violation, $1,000 for a second, and $2,000 for a third, suspension, or expulsion from the very MLS they need to do business.[2] More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings, "[a]lternative methods of selling houses are effectively foreclosed."[3] That is what Doorify MLS has done.

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what Doorify MLS is doing: using control of a home listing database that real estate agents in the

---

[1] *See Cummings v. Carroll,* 379 N.C. 347, 375–76 (2021); N.C. Real Estate Comm'n, 2021–2022 General Update Course § 3 (Broker Fiduciary Duties).

[2] Doorify MLS Rules & Regulations §§ 7(c)–(d), 9.1 (rev. May 26, 2026) (as posted Oct. 31, 2026) ("Doorify MLS Rules"); Doorify MLS, Rules and Regulations – Appendix A: Data Integrity Guidelines, Category III Violations & Data Integrity Fee Schedule (updated Aug. 2024) (as posted Oct. 31, 2026) ("Appendix A"); *see also* Am. Compl., *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 30, 2026), ECF No. 28 ("ARMLS FAC"), Ex. J, ECF No. 28-10. Appendix A does not list Rule 1(h) by name. On information and belief, Doorify MLS treats a Rule 1(h) violation as a Category III violation for "[l]ate entry of listing into the MLS system (Sec. 1)." Appendix A, Category III Violations; *see* ARMLS FAC Ex. P at 1, ECF No. 28-16 (describing this fine schedule).

[3] FTC, The Residential Real Estate Brokerage Industry ("Butters Report") at 130 (Dec. 1983).

Research Triangle region cannot work without, Doorify MLS and its co-conspirators block Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rules, Doorify MLS has refused Compass' demands to stop fining agents for publicly marketing listings outside the MLS and has sued Compass seeking a declaration that its rules are lawful.[4] Doorify MLS's excuses for punishing agents for phased marketing are meritless. In fact, MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues Doorify MLS claims will result from pre- or off-MLS public marketing have not transpired. Upon information and belief, Doorify MLS, then known as Triangle MLS, allowed sellers to withhold their listings from the MLS using a "Withheld" form, and did not fine agents for publicly marketing those listings. But now, in its lawsuit against Compass, Doorify MLS claims "transparency" and "free-riding." Doorify MLS does not care about homeowners; it is a members-only database that homeowners are unable to access and that fines agents just for following their client's lawful public marketing instructions. Moreover, Compass does not "free ride" as Doorify MLS claims; it pays Doorify MLS dues and is a significant contributor of listings to Doorify MLS.

8. Doorify MLS and its co-conspirators have caused significant economic harm to Compass and its agents, in addition to the immense harm Doorify MLS has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm Doorify MLS and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like Doorify

[4] ARMLS FAC ¶¶ 3, 16, 55–56, 76–80, 109–113.

MLS's foreclosed the option for Compass' agents to publicly market a home without giving it to Doorify MLS, thus forcing them to follow Doorify MLS's policies. Doorify MLS forces Compass and its agents to give their valuable home listing data to Doorify MLS. Because Compass is subject to Doorify MLS's rules, Compass has lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by Doorify MLS's illegal rules, must be paid back in triplicate and the illegal rules must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[5] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[6] As the FTC observed, the people who control the MLS "control . . . the most important aspects of brokerage practices."[7] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that set commission rates.[8] Since then, there have been over 100 antitrust

---

[5] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[6] *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).

[7] Butters Report at 15.

[8] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[9] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[10]

11. Doorify MLS is one of the largest MLSs in the country, with more than 14,000 real estate professional subscribers—competing brokers and agents—covering 16 counties in and around North Carolina's Research Triangle.[11] Doorify MLS is governed by a Board of Directors dominated by those competitors. In fact, each of the voting directors listed on Doorify MLS's website works for a real estate brokerage, and the majority work for brokerages that compete with each other and with Compass and its agents.[12]

12. For decades, Doorify MLS has been an unavoidable and dominant feature of residential real estate brokerage. Participation in Doorify MLS is essential for any real estate agent to work in many areas of the Research Triangle region; real estate agents cannot effectively represent clients in those areas without being members of Doorify MLS subject to its rules. While

---

[9] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[10] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

[11] ARMLS FAC ¶ 38; Doorify MLS Rules § 1.13; Doorify MLS, Doorify MLS Reelects Chris Bennett as Outside Director (Jan. 15, 2026) ("Bennett Announcement").

[12] Doorify MLS, Doorify MLS Election Results (board table) ("Election Results"); Doorify MLS, Meet the Board's Newest Members; Bennett Announcement; Triangle MLS, Inc., Amended and Restated Bylaws art. 6(C)–(D) (updated May 26, 2026) (as posted Oct. 31, 2026) ("Bylaws").

many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Agents cannot survive in business without participating in the MLS.

13. Showing Doorify MLS's incredible market power, agents must follow Doorify MLS's rules or Doorify MLS will fine and punish them, potentially by exclusion from Doorify MLS. Doorify MLS polices its members through staff that monitor how its members (who are competitors) represent their clients. Doorify MLS encourages competing agents to report to Doorify MLS any rule violations by their competitors for punishment, and it will process those complaints without revealing the complainant's identity.[13] While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because Doorify MLS membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

14. Doorify MLS Rules 1(a)–(b) and 1(h) specifically block competition among brokers and agents, and homeowner choice. Rules 1(a)–(b) force homeowners, brokers, and agents to give Doorify MLS their listings and force them into all of the Doorify MLS restrictions: every listing of a single-family home, vacant lot or acreage, or multifamily residential building in Doorify MLS's 16-county service area must be entered into Doorify MLS within one calendar day after the later of the listing contract's effective date or marketing date. One of those restrictions, Rule 1(h), dictates how a homeowner can publicly market their property. Unless they give the listing to Doorify MLS within one calendar day, homeowners and agents may not market the property to the public, which Rule 1(h) defines to include flyers displayed in windows, yard signs,

---

[13] Doorify MLS Rules §§ 9, 9.1, 9.3; Appendix A (How It Works).

digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), email blasts, multi-brokerage listing-sharing networks, applications available to the general public, cooperating with other brokerages, or any substantively similar activity.[14] Even though Doorify MLS does not own the home or represent the homeowner, Doorify MLS is dictating how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how Doorify MLS directs. Every option Doorify MLS offers comes down to the same choice: file the listing with Doorify MLS and distribute it to competing subscribers within one calendar day, incurring the disadvantages described above, or not publicly market the home at all. Even a "Limited Distribution" listing, which Doorify MLS keeps off IDX and third-party websites, must be filed with and distributed through Doorify MLS from the start, where it accrues days on market. No option lets a homeowner publicly market the home first and decide later whether and when to submit it to Doorify MLS. Through these rules, Doorify MLS and its co-conspirators control how homeowners and agents market properties on-Doorify MLS and outside-Doorify MLS. Doorify MLS and its co-conspirators, thus, control home marketing across the entire real estate industry in much of the Research Triangle region.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing,

---

[14] Doorify MLS Rules §§ 1(a)–(b), 1(h), 1.13. Doorify MLS's Help Center, as of October 31, 2026, publishes Rule 1(h) with the revision date May 26, 2026, and defines public marketing to include "cooperating with other brokerages." The version Doorify MLS filed in the Southern District of New York, dated August 27, 2026, omits that phrase. *See* ARMLS FAC Ex. I § 1(h), ECF No. 28-9. Under either version, the public marketing Compass' clients want triggers Rule 1(h).

it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon," and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. Phase One is blocked, and Phase Two is severely restricted, by Doorify MLS rules: Phase One listings cannot be publicly marketed, and Phase Two Coming Soon listings have severe restrictions on what the homeowner and agent can do. Specifically, Doorify MLS states that even if the homeowner wants their agent to show buyers the property, a home in "Coming Soon" status may not be shown to anyone or held open; the listing must first be entered into Doorify MLS, which sends it to IDX, VOW, and syndication websites; and the seller must sign a "Coming Soon / Hold" form that is uploaded to the listing.[15] Doorify MLS states that all Coming Soons must be restricted to 14 days, even if the homeowner wants their home listed as a Coming Soon for longer.[16]

18. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the ***homeowner's*** sales pitch to buyers) the history of price changes and days on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner's own advertisement often prevents homeowners from obtaining the full value of their property. This is unique to residential real estate:

---

[15] Doorify MLS Rules § 1.3(2); *see id.* §§ 17(b), 17.8(2); Doorify MLS, New Listing Option: Limited Distribution ("Listing Options Flyer").

[16] Doorify MLS Rules § 1.3(2).

sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (that comprise and control Doorify MLS) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

19. This unreasonably restrains trade in two ways. Doorify MLS's agent members, including its Board members, compete directly with one another and with Compass' agents for homeowners, and Doorify MLS Rules 1(a)–(b) and 1(h) block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[17] Moreover, Doorify MLS is blocking competition between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why Doorify MLS Rules 1(a)–(b) and 1(h) violate the law. As recognized by the FTC, to comply with the antitrust laws, an MLS

---

[17] Butters Report at 130.

must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed for over 50 years.[18] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), which governs Doorify MLS,[19] expressly provides that an "***MLS shall not: Make any rule regulating the advertising or promotion of any listing***,"[20] and preserves an alternative to the MLS, which it calls an "office exclusive."[21] Upon information and belief, before Doorify MLS Rule 1(h), Doorify MLS had no restrictions on how office exclusives were publicly marketed.

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings" required by rules like Doorify MLS Rules 1(a)–(b). "Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[22] Doorify MLS Rules 1(a)–(b) and 1(h) violate the Fourteen Points antitrust policy and cause the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to Doorify MLS's Rule 1(h) that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[23] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS

---

[18] *Id.* at 129–30.

[19] Doorify MLS Rules §§ 4.8, 14 (approved amendments are submitted to NAR for review); Bylaws art. 6(D)(8) (Raleigh Regional may remove any director who fails to act consistently with NAR's policies for operating an MLS); Appendix A (Hearing Procedures) (hearings follow NAR's Code of Ethics and Arbitration Manual). Doorify MLS also admits participants who are not NAR members. Bylaws art. 4.6; Doorify MLS Rules § 4.8.

[20] Butters Report at 134 n.354 (emphasis added).

[21] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

[22] Butters Report at 130.

[23] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[24]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of Doorify MLS's combination of competitors have forced upon the industry. But Doorify MLS blocks that choice and the competition that choice would bring.

23. Doorify MLS and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving the commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price, 34% fewer days on the MLS, and 29% fewer price cuts; and (3) cannot benefit from the fiduciary duties agents owe to their clients.

24. Doorify MLS has no valid justifications for its illegal conduct. Any claim Doorify MLS makes is undermined by recent history: upon information and belief, for a period of time, Doorify MLS allowed agents and their clients to market pre- and off-MLS without fines, Doorify MLS succeeded, and homes were legally sold throughout the Research Triangle region. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. Doorify MLS's restraints on competition are not about "transparency." Doorify MLS does not allow homeowners

---

[24] Butters Report at 130.

or homebuyers to become members or to directly search or access its database. Doorify MLS does not accept for-sale-by-owner listings. Doorify MLS's own rules allow listings to be hidden, just as long as they are not publicly marketed outside of Doorify MLS.[25] Its restraints also have nothing to do with "free-riding." The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[26] Compass also gets nothing for free: it pays dues and contributes a significant number of listings to Doorify MLS. Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS). On the other hand, Doorify MLS gives listings to third-party portals and other companies that do not contribute any listings.[27]

25. Compass hereby brings claims against Doorify MLS for violating the Sherman Act, 15 U.S.C. § 1.

## PARTIES

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and

---

[25] Doorify MLS Rules §§ 1(e), 1(g), 1.4.1, 4.4, 10; Bylaws art. 4.2.

[26] *Realcomp II, Ltd.*, 635 F.3d at 835.

[27] Doorify MLS Rules §§ 1.2(9), 11, 17; Bennett Announcement (describing royalties paid to Doorify MLS by REdistribute, an MLS-owned company that provides MLS data to financial institutions, insurers, and government-sponsored enterprises).

"Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including North Carolina. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including North Carolina.

27. Plaintiff Compass Carolinas, LLC is a Delaware limited liability company with its headquarters at 4525 Sharon Road, Third Floor, Charlotte, North Carolina 28211. Compass Carolinas, LLC is a wholly owned indirect subsidiary of Compass, Inc. It is registered with the North Carolina Secretary of State to transact business in North Carolina, where it operates a real estate brokerage under the "Compass" brand and is licensed as a real estate firm by the North Carolina Real Estate Commission. Compass Carolinas, LLC is an indirect wholly owned subsidiary of Compass, Inc.[28]

28. Defendant Triangle MLS, Inc., d/b/a Doorify MLS, is a North Carolina corporation with its principal place of business in Cary, North Carolina at 111 Realtors Way.[29] Doorify MLS is a wholly owned subsidiary of the Raleigh Regional Association of REALTORS® ("Raleigh Regional").[30] Doorify MLS has more than 14,000 subscribers, and agents at another MLS, Longleaf Pines MLS, have access to Doorify MLS records through a data share agreement.[31] Each of the voting directors listed on Doorify MLS's website works for a real estate brokerage, and the majority work for brokerages that compete with each other and Compass and its agents.

---

[28] N.C. Sec'y of State, Application for Certificate of Authority of Compass North Carolina, LLC (filed Oct. 8, 2018); N.C. Sec'y of State, 2026 Annual Report of Compass Carolinas, LLC (filed Apr. 6, 2026).

[29] ARMLS FAC ¶ 16; Bylaws art. 1.1.

[30] Bylaws art. 1.2; ARMLS FAC ¶ 16.

[31] ARMLS FAC ¶ 38; Doorify MLS, *Longleaf Pines MLS Data Share FAQ*, https://support.doorifymls.com/hc/en-us/articles/9947636604307-Longleaf-Pines-MLS-Data-Share-FAQ.

29. Doorify MLS is a contract, combination, or conspiracy of competing agents and brokers. Doorify MLS's participating brokers and agents compete directly with one another and with Compass for homeowner clients, homebuyer clients, and agents. Those brokers and agents follow and enforce Doorify MLS's rules, and Doorify MLS is governed by a Board of Directors dominated by competing brokers and agents.

30. Doorify MLS Rule 1.13 defines its "Service Area" as sixteen North Carolina counties: Wake, Durham, Orange, Alamance, Caswell, Chatham, Franklin, Granville, Halifax, Harnett, Johnston, Lee, Nash, Person, Vance, and Warren.[32] Moreover, Doorify MLS is the only MLS in the following areas of North Carolina: Durham County, Wake County, and Franklin County.

**DEFENDANT'S CO-CONSPIRATORS**

31. Competing agents, including those enforcing Doorify MLS's rules, members of Doorify MLS's Board of Directors, and members of the MLS Hearing Committee, conspired with each other, with Doorify MLS, and with Doorify MLS's owner, Raleigh Regional, to design, approve, enforce, and implement Doorify MLS Rules 1(a)–(b) and 1(h). Each December, Doorify MLS's directors approve fifteen MLS participants or subscribers—that is, competing brokers and agents—to serve on the MLS Hearing Committee, which hears contested violations in panels on which, except for "Wake," no association or board may have more than one member; appeals go to Doorify MLS's directors.[33] Raleigh Regional selects or influences the selection of Doorify MLS's Board of Directors. Raleigh Regional is Doorify MLS's sole shareholder. It appoints a non-

---

[32] Doorify MLS Rules § 1.13; *see also* Bylaws art. 3 (authorizing Doorify MLS to operate in North Carolina and Virginia).

[33] Appendix A (MLS Hearing Committee; Hearing Appeals); Doorify MLS Rules § 9.1.

voting director each year, and its chief executive officer sits on the Board as the non-voting owner's representative and is a voting member of Doorify MLS's Executive Committee, which may act in the Board's stead on urgent matters. Raleigh Regional may remove any director who fails to act consistently with NAR's policies for operating an MLS; if a director election lacks a quorum, Raleigh Regional's board chooses the directors; Raleigh Regional must ratify any amendment to the bylaws' provisions governing the Board; and Doorify MLS's remaining assets pass to Raleigh Regional if it dissolves. Four other Realtor® associations—the Durham Regional Association of REALTORS®, the Orange Chatham Association of REALTORS®, the Johnston County Association of REALTORS®, and the Burlington-Alamance County Association of REALTORS®—join Raleigh Regional as Doorify MLS's stakeholder associations. Each qualifying stakeholder association may nominate up to two director candidates and is entitled to a director seat, and each appoints up to three members, including its chief executive officer, to a Stakeholder Association Council that meets at least quarterly to discuss Doorify MLS's rules and policies and elects a member of the Board. Realtor® association staff may file complaints of rule violations, and complaints of unethical conduct by Realtor® participants are referred to their associations.[34]

32. Doorify MLS's co-conspirators performed acts and made statements in furtherance of Doorify MLS's anticompetitive conduct. Doorify MLS is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

[34] Bylaws arts. 1.2, 6(C), 6(D)(2), (5)–(8), 7.1, 8.1, 8.3, 11.2, 13; Bennett Announcement (identifying Doorify MLS's stakeholder associations); Doorify MLS Rules § 9.2; Appendix A (How It Works).

## JURISDICTION AND VENUE

33. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from Doorify MLS's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

34. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

35. This Court has personal jurisdiction over Doorify MLS because its headquarters and principal place of business are in this district, and Doorify MLS conducts substantial business in this district.

36. Venue is appropriate in this district and in the Western Division because Doorify MLS's headquarters and principal place of business are in Cary, Wake County, North Carolina, and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this district. 28 U.S.C. § 1391; 15 U.S.C. § 22. Doorify MLS was organized as a North Carolina corporation in 1995 and lists its principal office in this district in its filings with the North Carolina Secretary of State.

## TRADE AND COMMERCE

36. Doorify MLS has entered into agreements with each of its more than 14,000 subscribers and facilitates the sale of tens of thousands of residential homes and condominiums each year—its total listings exceeded 87,000 in 2025—with total closings valued in at least the

tens of billions of dollars.[35] These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

37. Relevant Product Markets. There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

38. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control Doorify MLS compete in the Brokerage Services Market.

39. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology

---

[35] Doorify MLS Rules § 7; Bylaws arts. 4.2, 4.4; ARMLS FAC ¶ 38; Bennett Announcement (Doorify MLS "helps manage tens of billions in real estate transactions every year"); Doorify MLS, *End of the Year Wrap-Up + A Glimpse Into 2026*, https://doorifymls.com/news/2025-year-in-review/2979.

agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control Doorify MLS compete in the Agent Services Market.

40. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Doorify MLS participates in the MLS Market.

41. Relevant Geographic Market. The relevant geographic market for each of the defined product markets is no larger than Doorify MLS's service area, as defined by Doorify MLS Rule 1.13 (the "Doorify MLS service area"). A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Brokers and agents cannot avoid Doorify MLS's rules by using a neighboring MLS or an MLS with a data sharing agreement with Doorify MLS for several reasons:

(a) Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

(b) Doorify MLS rules apply to all agents and listings affiliated with a "Participant," which means that every listing by an agent affiliated with a brokerage must be given to Doorify MLS. Even if the brokerage has only a single agent who needs to access Doorify MLS, the entire brokerage must become a member. Specifically, each Participant agrees to be bound by Doorify MLS's rules and is responsible for the actions of every affiliated subscriber; every licensee affiliated with the Participant's office must enroll as a subscriber unless the licensee subscribes to another MLS and obtains a fee waiver, and even then the Participant must continue to submit its listings to Doorify MLS; and the Participant firm pays the fees for all of its affiliated licensees.[36] Thus, if one agent in a brokerage needs Doorify MLS access, then all agents in that brokerage are bound by Doorify MLS's rules.

42. To serve their clients and compete in the Doorify MLS service area, brokers and agents must have access to Doorify MLS and follow Doorify MLS's rules. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine to adopt, follow, and enforce the Doorify MLS rules collectively have market power. In the MLS Market, Doorify MLS has market power.

43. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in

[36] Doorify MLS Rules §§ 6.1, 6.2.1(b), 7; Bylaws art. 4.2.

almost every relevant market."[37] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[38]

## FACTUAL ALLEGATIONS

### *MLSs and the Antitrust Laws*

44. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. Doorify MLS is in the business of operating a broker cooperative by:

(a) enhancing cooperation among its Participants;

(b) accumulating and disseminating information so that Participants can prepare appraisals, analyses, and other valuations of real property for clients and customers;

(c) correlating and disseminating listing information so that Participants may better serve their clients and the public;

(d) giving the public limited access to listing data through Participants' IDX and VOW websites; and

(e) distributing listing data through syndication and licensing it to third parties.[39]

---

[37] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), reprinted in 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

[38] DOJ & FTC, Competition in the Real Estate Brokerage Industry 12 (Apr. 2007) ("2007 DOJ/FTC Report"), available at https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

[39] Bylaws art. 2; Doorify MLS Rules §§ 1.2(9), 11, 12.2, 17–18; Bennett Announcement.

45. MLSs also make and enforce rules. Doorify MLS explains how competing agents can help enforce Doorify MLS's rules, and it provides a specific process to report violations of Doorify MLS Rule 1(h).[40]

46. In addition to operating this members-only database, some MLSs, like Doorify MLS, license agent and homeowner data to third parties, such as real estate web portals and technology vendors, which monetize it in various ways, *e.g.*, selling leads for potential buyers to agents by displaying the data on websites with advertising alongside, and by creating tools to recruit agents from brokerages.[41]

47. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are comprised of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

48. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently

[40] Appendix A (How It Works); Doorify MLS Rules § 9; Doorify MLS, *How Can I Report a Violation?*, https://support.doorifymls.com/hc/en-us/articles/1500007589781-How-Can-I-Report-a-Violation.

[41] Bennett Announcement; Doorify MLS Rules §§ 1.2(9), 12.2.

pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing competition among them. MLSs wield the unique power to fine and punish their own members.

49. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[42] As the FTC wrote, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[43] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

50. In the 1940s, the DOJ brought civil and criminal charges against MLSs that set commission rates.[44] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[45] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[46]

---

[42] *Realty Multi-List*, 629 F.2d at 1370.

[43] Butters Report at 92–93.

[44] *See Nat'l Ass'n of Real Est. Bds*., 339 U.S. at 487.

[45] *Realcomp II, Ltd.*, 635 F.3d at 819.

[46] *Consol. Multiple Listing Serv., Inc*., 2009 WL 3150388, at *2.

51. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies . . . have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."[47] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[48]

52. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC explained:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[49]

53. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office exclusive."[50] Specifically, the antitrust policy expressly provided that "***MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'***"[51] Point 10 provided that "***MLS shall not: Make any rule regulating the***

---

[47] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351; *Realcomp II*, 635 F.3d 815.

[48] 2007 DOJ/FTC Report at 64 (describing and citing cases).

[49] Butters Report at 109.

[50] *Id*. at 130.

[51] *Id*. at 134 n.354 (emphasis added).

***advertising or promotion of any listing.***"[52] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[53] The term "office exclusive" just meant the listing was not provided to the MLS. Doorify MLS's mandatory submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid Doorify MLS's restrictions or market their homes how they choose under Doorify MLS Rules 1(a)–(b) and 1(h).

***Doorify MLS Rules 1(a)–(b) and 1(h)***

54. Doorify MLS's rules are approved by its Board of Directors, the majority of whose voting directors work for brokerages that compete with Compass. Amendments to the rules require a resolution of the Board, approved amendments are submitted to NAR for review, and enforcement of the rules is at the Board's sole discretion. Doorify MLS staff decide alleged violations and impose fines and suspensions. A participant who contests a sanction may request a hearing before a panel of the MLS Hearing Committee, whose fifteen members—Doorify MLS participants and subscribers, that is, competing brokers and agents—the directors approve each December, and may appeal the panel's decision only to Doorify MLS's directors, after Doorify MLS's President and counsel screen the request.[54]

---

[52] *Id*. (emphasis added).

[53] *Id*. at 130.

[54] Doorify MLS Rules §§ 9, 9.1, 14; Appendix A (MLS Hearing Committee; Hearing Appeals; Hearing Outcome); Bylaws art. 6(G)(f); Election Results.

55. Rules 1(a) and 1(b) provide that every listing of a single-family home, vacant lot or acreage, or multifamily residential building must be entered into Doorify MLS within one calendar day after the later of the listing contract's effective date or marketing date, and Rule 1.13 makes that requirement mandatory for every listing in the Doorify MLS service area. Rule 1(h) dictates how homeowners can publicly market their properties. Unless they give the listing to Doorify MLS within one calendar day, agents and homeowners may not market the property to the public, which Rule 1(h) defines to include flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), email blasts, multi-brokerage listing-sharing networks, applications available to the general public, cooperating with other brokerages, or any substantively similar activity.[55] The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

56. If a Doorify MLS Participant violates Doorify MLS's rules, Doorify MLS can punish the real estate agent and/or brokerage by levying fines or blocking their access to the listings database.[56] Doorify MLS's "Data Integrity Fee Schedule" does not list Rule 1(h) by name, and its catch-all for violations not otherwise covered appears in four different categories, leaving Doorify MLS staff to decide how severely to punish public marketing. On information and belief, Doorify MLS treats a violation of Rule 1(h) as a Category III "late entry" violation, punishable by a fine of at least $500 for a first violation, $1,000 and a seven-day suspension for a second, $2,000 and a 30-day suspension for a third, and potential suspension from Doorify MLS for one year for a

---

[55] Doorify MLS Rules §§ 1(a)–(b), 1(h), 1.13; *see supra* note 14 (version of Rule 1(h) that Doorify MLS filed in the Southern District of New York).

[56] Doorify MLS Rules §§ 7, 9.1; Appendix A (Data Integrity Fee Schedule).

fourth, with reinstatement only if Doorify MLS's Board approves.[57] Doorify MLS staff impose the fine by notice, without a hearing, and the first step in enforcement is to hide the listing, which disappears from Doorify MLS's systems and stops syndicating until staff verify compliance. To contest a fine, the agent must request a hearing within ten days and pay a $100 processing fee, and a hearing panel that finds a violation has no authority to reduce the fine: the assessed fine "shall be paid."[58] Doorify MLS thus punishes public marketing far more harshly than nearly every other rule violation: it places public marketing in the same category, with the same $500 minimum fine, as entering a home without a showing appointment, placing a lockbox without the seller's permission, and showing a home in Coming Soon status, and its minimum fine for a first violation equals the maximum fine for deliberately entering inaccurate data on a listing, a Category II violation. The only violations Doorify MLS punishes more harshly—disclosing MLS passwords, lockbox codes, and showing-appointment codes—are Category IV violations.[59] Doorify MLS Rule 9.1 also gives Doorify MLS discretion to impose fines, suspension, or both, and Appendix A terminates the Doorify MLS service of any office that does not pay its fines within 90 days.[60] Doorify MLS polices its rules, as do Doorify MLS's members.

***See It First™ on Compass***

57. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take

---

[57] Appendix A (Category III Violations; Data Integrity Fee Schedule); *see also* ARMLS FAC Ex. P at 1, ECF No. 28-16 (describing this fine schedule).

[58] Doorify MLS Rules § 9.1; Appendix A (Hearing Request; Hearing Outcome; Enforcement Notes).

[59] Appendix A (Category IIb, III, and IV Violations; Data Integrity Fee Schedule).

[60] Doorify MLS Rules § 9.1; Appendix A (Data Integrity Fee Schedule).

a number of different forms. "Office exclusives" are a long-standing practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available to other participants in the MLS and may be posted to an agent's website or to other selected websites.

58. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on Compass to clients where MLS rules permit it, although Doorify MLS impedes that competition to protect its members, who are Compass' competition.

59. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[61] acknowledging that the listing will not initially appear in the active MLS feed.

60. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask

---

[61] These disclosures are available at https://www.compass-homeowners.com.

a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

61. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million monthly active users. Coming Soon status signals to prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

62. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

63. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever she wants in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS forces the homeowner's advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in their listing, including days on market and history of price changes.

64. The phased marketing strategy has several advantages for homeowners.

65. ***First,*** because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

66. ***Second***, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

67. ***Third,*** MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

68. ***Fourth,*** pre- and off-MLS marketing offer the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offer the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

69. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks

associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals.

70. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy had 34% fewer days on the MLS and experienced 29% fewer price cuts. Additionally, properties sold for 4.6% more. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

71. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to Doorify MLS's Rules 1(a)–(b) and 1(h) in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the court held both that Zillow failed to prove

its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[62]

72. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

***Anticompetitive Effects***

73. Doorify MLS Rules 1(a)–(b) and 1(h) restrain trade in several ways.

74. ***First***, because Doorify MLS's participating brokers and agents (including Board members) compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of Doorify MLS Rules 1(a)–(b) and 1(h) block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[63]

75. ***Second***, Doorify MLS is blocking competition by other public marketing methods, identified by Doorify MLS Rule 1(h) as flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), email blasts, multi-brokerage listing-sharing networks, applications available to the general public, and cooperating with other brokerages, and most significantly the Compass website itself.

---

[62] *Zillow Group, Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-05451, Mem. Op. & Order 43–44 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

[63] Butters Report at 130.

76. ***Third***, Doorify MLS Rules 1(a)–(b) and 1(h) also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

77. ***Fourth***, Doorify MLS Rules 1(a)–(b) and 1(h) further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

***Doorify MLS's Justifications Are Pretextual***

78. Doorify MLS has no valid justification for its illegal conduct. Many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by Doorify MLS or prohibit its members from selectively editing or excluding the Doorify MLS listings they show their buyer clients. Doorify MLS Rules 1(a)–(b) and 1(h) govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

79. Doorify MLS's restraints on competition are not about "transparency." Doorify MLS does not allow homeowners or homebuyers to become members. Doorify MLS does not accept for-sale-by-owner listings. And Doorify MLS's own rules allow listings to be hidden, just as long as they are not publicly marketed.[64] Nor are Doorify MLS's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See

[64] Doorify MLS Rules §§ 1(e), 1(g), 1.4.1, 4.4, 10.

It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

80. Doorify MLS's restraints also have nothing to do with "free-riding." In its lawsuit against Compass, Doorify MLS has accused Compass of seeking to "free ride" on the MLS by participating when it chooses but otherwise withholding listings from the MLS.[65] That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, ***every*** member of Doorify MLS will be free to offer pre- and off-MLS marketing strategies to their clients.

81. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass provides value to Doorify MLS and its members in three critical ways: (1) by exposing its buyer clients to listings submitted by other members; (2) by submitting listings to Doorify MLS post-sale even when they were not previously submitted to Doorify MLS, adding to the body of information that members use for advising clients on pricing and other matters; and (3) by submitting listings to Doorify MLS for the benefit of all buyer agents in the Doorify MLS service area after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere. Compass also contributes a significant number of listings to Doorify MLS.

82. In its lawsuit and on its website, Doorify MLS has asserted other arguments about the purported drawbacks of pre- and off-MLS marketing that amount to little more than

---

[65] ARMLS FAC ¶¶ 3, 55–56, 80.

paternalistically telling homeowners and their agents what is best for them. Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

83. Doorify MLS's purported alternatives do not cure the restraint. Doorify MLS Rule 1.4.1, called an "Office Exclusive Listing," requires that the property be kept hidden and marketed exclusively within the listing brokerage—no yard sign, no website, no social media post, and no open house. Even then, the listing must be filed with Doorify MLS, with a certification signed by the seller, the listing agent, and the broker-in-charge, within one calendar day; the form Doorify MLS recommends for that certification bars the listing broker from cooperating with brokers outside the firm and treats even "word of mouth" as public marketing; and if anyone publicly markets the property, the listing must be distributed to all Doorify MLS subscribers within one calendar day. Doorify MLS's "Limited Distribution" option, Rule 1.4.2, keeps a listing off IDX and third-party websites but requires the listing to be filed with Doorify MLS and distributed to all of its subscribers from the start, where it accrues days on market. Doorify MLS's "Coming Soon" status lasts at most 14 days, bars all showings and open houses, and requires the listing to be entered in Doorify MLS. None of these options lets a homeowner publicly market a home before, or without, submitting it to Doorify MLS.[66]

***Antitrust Injury to Compass, Its Agents, and Homeowners***

84. Doorify MLS's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

---

[66] Doorify MLS Rules §§ 1(h), 1.3(2), 1.4.1, 1.4.2, 17(b); Office Exclusive Form at 1–2; Listing Options Flyer. The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. *Cf.* Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). Rule 1.4.1 is precisely the sort of "exception" that makes Doorify MLS Rules 1(a)–(b) and 1(h) anticompetitive.

(a) **Lost Commissions and Financial Harm to Brokerage**: Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

(b) **Degradation of Compass Website**: The enforcement of Doorify MLS Rules 1(a)–(b) and 1(h) degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

(c) **Depressed Sales Prices and Lost Sales**: By eliminating Compass' ability to pre-market and test pricing, Doorify MLS rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

(d) **Excessive Days on Market and Public Price Drops**: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions on the listing, which depress sale prices and related sales commissions.

(e) **Lost Agents**: Doorify MLS Rules 1(a)–(b) and 1(h) prevent Compass from competing against other brokerages for agents by offering agents innovative pre-marketing strategies that they can offer their clients.

(f) **Loss of Convenience and Harm to Innovation**: Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

85. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by Doorify MLS and the agents and brokerages who control it. Doorify MLS's rules are anticompetitive because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that Doorify MLS Rules 1(a)–(b) and 1(h) foreclose, Doorify MLS's rules prevent Compass from offering phased marketing to homeowners and agents in the Doorify MLS service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: Doorify MLS's rules prevent Compass from offering homeowners and agents innovative strategies they want.

86. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from Doorify MLS's rules and their enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

***Doorify MLS's Rule Enforcement Against Compass***

87. By enforcing Doorify MLS Rules 1(a)–(b) and 1(h) through fine notices, escalating fines and suspensions, and the hiding of noncompliant listings, and the threat of suspension and

expulsion from the MLS, Doorify MLS has made it impossible for Compass to perform its obligations in accordance with homeowners' instructions.

88. On August 27, 2026, Compass' Chief Legal Officer, Ethan Glass, asked Doorify MLS to agree by September 1, 2026, that it would not fine or penalize real estate professionals for publicly marketing office exclusive listings. Doorify MLS's Chief Executive Officer responded on September 1, 2026, that rule changes must originate with subscribers through their elected Board representatives and invited a formal rule proposal, while Doorify MLS continued to enforce its fines. On September 17, 2026, Compass demanded that Doorify MLS confirm in writing, by October 6, 2026, that it would not fine or punish real estate professionals for publicly marketing office exclusive listings. Compass followed up on September 18, 2026.[67] On October 5, 2026, Compass agreed to extend Doorify MLS's deadline to and including October 20, 2026. Doorify MLS never responded to the substance of Compass' demand.[68] Instead, on October 21, 2026, the day after its extended deadline passed, Doorify MLS joined five other MLSs in suing Compass in the United States District Court for the Southern District of New York, seeking a declaration that its rules are lawful under federal law and North Carolina law. The MLSs amended their complaint on October 30, 2026.[69]

---

[67] Email from Ethan Glass, Chief Legal Officer, Compass, to MLS leadership, including Matt Fowler, Chief Executive Officer, Doorify MLS (Aug. 27, 2026); Email from Matt Fowler to Ethan Glass (Sept. 1, 2026); Letter from Nathan P. Eimer to Matt Fowler (Sept. 17, 2026), ARMLS FAC Ex. P, ECF No. 28-16; Letter from Nathan P. Eimer to Matt Fowler (Sept. 18, 2026).

[68] Email from Mitchell A. Skinner, counsel for Doorify MLS, to Nathan P. Eimer (Sept. 18, 2026); Email from Ethan Glass to Mitchell A. Skinner (Oct. 5, 2026); ARMLS FAC ¶ 64.

[69] Compl., *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253 (S.D.N.Y. Oct. 21, 2026), ECF No. 1; ARMLS FAC ¶¶ 16, 109–113.

***Doorify MLS's Continuing Violations***

89. Doorify MLS's anticompetitive conduct is ongoing. Doorify MLS Rules 1(a)–(b) and 1(h) are not merely rules adopted in the past; they are a continuing agreement among competing brokers to penalize and exclude any broker or agent who follows a homeowner's instruction to publicly market a home outside the MLS, and Doorify MLS enforces that agreement through fine notices, escalating fines and suspensions, hearings before panels of competing brokers, and the threat of suspension and expulsion.[70]

90. Within the four years before this complaint was filed, Doorify MLS and its co-conspirators have committed new and independent acts that renew the restraint and inflict new and accumulating injury on Compass, including:

(a) issuing violations against Compass agents for violating Rule 1(h);

(b) re-adopting Rules 1(a)–(b) and 1(h) through Doorify MLS's Board of Directors, including in the versions of its rules dated May 26, 2026, and August 27, 2026;[71]

(c) adopting, effective September 30, 2025, a "Limited Distribution" listing option while keeping Rule 1(h)'s one-calendar-day submission requirement in force;[72]

(d) revising its office-exclusive seller form on or about April 11, 2025, while preserving its ban on public marketing;[73]

---

[70] Doorify MLS Rules §§ 7, 9, 9.1; Appendix A.

[71] Doorify MLS Rules §§ 1(a)–(b), 1(h), 14; ARMLS FAC Ex. I, ECF No. 28-9 (rev. Aug. 27, 2026).

[72] Listing Options Flyer; Doorify MLS Rules § 1.4.2; Doorify MLS, *Limited Distribution FAQ*, https://support.doorifymls.com/hc/en-us/articles/44678038908691-Limited-Distribution-FAQ.

[73] Office Exclusive Form at 1–2.

(e) approving, each December, fifteen competing brokers and agents to serve on the MLS Hearing Committee that decides alleged violations, and seating new directors each January;[74]

(f) refusing Compass' September 17, 2026 demand and, on October 21, 2026, suing Compass to obtain a declaration that it may continue enforcing Rules 1(a)–(b) and 1(h); and

(g) continuing, each day, to prohibit Compass and its agents from publicly marketing listings in accordance with homeowners' instructions.

91. Each of these acts required Doorify MLS to make a fresh, discretionary decision to maintain, tighten, or enforce Rules 1(a)–(b) and 1(h)—a decision Doorify MLS was free not to make. Each act caused Compass new injury—lost commissions, lost ancillary revenue, lost agents, and diminished value of its technology platform—that Compass could not have recovered in an earlier action because that injury had not yet occurred. Compass seeks damages for injuries caused by acts within the applicable limitations periods, and its claims for injunctive relief are timely because Doorify MLS continues to maintain Rules 1(a)–(b) and 1(h) and to threaten their enforcement today.

## CAUSES OF ACTION

### COUNT I
### PER SE ILLEGAL GROUP BOYCOTT
### IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

92. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

---

[74] Appendix A (MLS Hearing Committee); Bylaws art. 6(D)(7)(D).

93. The majority of the voting directors listed on Doorify MLS's website work for brokerages that are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

94. Through Doorify MLS Rules 1(a)–(b) and 1(h), Doorify MLS forces Compass and its agents to forgo either (1) a critical input to their business (access to Doorify MLS in the Doorify MLS service area) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

95. The agreement by and among Doorify MLS and its governing members to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because Doorify MLS possesses market power in the MLS Market in the Doorify MLS service area; it controls access to an input—MLS participation—that agents need to compete effectively in the Doorify MLS service area; and the challenged rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

96. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## COUNT II
## COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

97. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

98. Membership in Doorify MLS and access to the MLS it operates is critical for agents working in the Doorify MLS service area. Doorify MLS is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. Doorify MLS and the agents and brokerages who control it are using their control of Doorify MLS to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing Doorify MLS Rules 1(a)–(b) and 1(h), which prevent Compass from offering See It First™ on Compass to its homeowner clients and agents and prevent any other agent from offering innovative pre- and off-MLS marketing strategies.

99. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

100. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## REQUESTED RELIEF

Compass requests the following:

(a) A trial by jury as to all claims so triable;

(b) A declaration that Doorify MLS Rules 1(a)–(b) and 1(h) are an unlawful restraint of trade under 15 U.S.C. § 1;

(c) An injunction prohibiting Doorify MLS from adopting, maintaining, or enforcing Doorify MLS Rules 1(a)–(b) and 1(h), or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

(d) An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

(e) An award of Plaintiff's attorneys' fees and costs of suit; and

(f) Such other relief that the Court deems just and equitable.

Dated: November 12, 2026

By: /s/ *Patrick Grayson Spaugh*
Christopher Jones (N.C. Bar No. 27265)
Chris.Jones@wbd-us.com
Patrick Grayson Spaugh (N.C. Bar No. 49532)
Patrick.Spaugh@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville St., Suite 1100
Raleigh, NC 27601
Telephone: 919-755-8173
Fax: 919-755-6180
Local Civil Rule 83.1(d) Counsel

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
Brian Y. Chang (*pro hac vice forthcoming*)
bchang@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

*Attorneys for Plaintiffs Compass, Inc. and Compass Carolinas, LLC*